

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-16-00173-CV

———————————————————

EMERSON ELECTRIC CO., D/B/A FUSITE, AND EMERSON CLIMATE TECHNOLOGIES, INC., Appellants

V.

CLARENCE JOHNSON AND UNITED STATES LIABILITY INSURANCE COMPANY, Appellees

On Appeal from the 48th District Court
Tarrant County, Texas
Trial Court No. 048-268665-13

Before Walker, Kerr, and Pittman, JJ.
Memorandum Opinion by Justice Pittman

**MEMORANDUM OPINION**

This is a products liability case. Appellee Clarence Johnson sued Appellants Emerson Electric Co., d/b/a Fusite (Fusite) and Emerson Climate Technologies, Inc. (Emerson) after he was seriously injured by the explosion of a heating, ventilation, and air conditioning (HVAC) compressor that was designed and sold by Emerson and was equipped with a terminal designed and manufactured by Fusite. Appellee United States Liability Insurance Company (the Insurance Company) intervened during the underlying lawsuit. After a lengthy jury trial, the trial court rendered a judgment in favor of Johnson and the Insurance Company. In six issues, Fusite and Emerson challenge the legal and factual sufficiency of the evidence supporting the jury's verdict on Johnson's design defect claims, marketing defect claims, and mental anguish damages; they challenge the trial court's decision to allow Johnson's expert to testify regarding design defects in the HVAC compressor; and they challenge the jury charge, contending that it was erroneous as to the design defect and marketing defect claims. For the reasons set forth herein, we affirm.

## BACKGROUND

### I.    What is Terminal Venting?

An HVAC compressor and its motor are encased in a sealed cylinder. Power is provided to the motor through a steel terminal sealed onto the compressor shell. This terminal holds conductive pins that pass through it into the compressor. The pins connect to a power source that powers the compressor. These pins sit in an

2

insulating agent, such as glass. Electrical malfunctions can cause excess current to flow through the system and heat the terminal pins so much that they weaken the glass holding them in place to the point that it can no longer hold them. The pressure inside of the compressor can then expel the pins from the terminal, allowing the heated refrigerant and oil inside the compressor to leak or shoot out. This event is referred to in the industry as "terminal venting."[1] "Terminal venting with ignition" occurs when the oil and refrigerant ignite. A terminal vent caused Johnson's injuries in this case.

## II. A Terminal Vent Occurs While Johnson Services the Emerson Compressor.

Johnson is a licensed HVAC technician. He has owned his own HVAC servicing business since the mid-1990s. In 2012, one of his clients was Miller Food Mart. On August 2, 2012, he replaced one of the two compressors in the Miller Food Mart's HVAC unit with the Emerson compressor that later injured him.

The day following the installation, Johnson received a report that the HVAC unit was not working properly. When Johnson arrived at the store, his nephew and assistant, Antonio Morris, had already arrived. Morris told Johnson that the fuses had

---

[1]Terminal venting, or "hermetic leakage," can also occur from arcing—when the current "jumps" from the element carrying it to another element. Arcing generates high heat, and an arc to the terminal pins or some other element in the compressor can cause the glass holding the pins to heat enough to soften. A terminal pin can also fail—and thereby create a hole from which the compressor's contents can leak—from pressure or physical damage.

3

blown in the disconnect box attached to the HVAC unit. This did not cause Johnson any specific concerns about the new Emerson compressor because this particular HVAC unit had a tendency to blow fuses. After the men replaced the fuses and reset the breaker, Johnson turned the HVAC unit on and heard an unusual noise, "a rumbling or something," and he began to look for the source. Unbeknownst to Johnson, the compressor had suffered an internal failure at some point between the time of its installation and his return to the store to troubleshoot the problem on August 3. Excessive heat inside the compressor had begun to soften the glass insulation holding the terminal pins.

After isolating different components, Johnson determined that the sounds came from the new Emerson compressor. Johnson decided to get an ohm reading[2] on the new compressor.[3] This reading required him to remove the cover from the terminal. When Johnson removed the terminal's cover, a terminal vent occurred; two of the three terminal pins shot out of the Emerson compressor, allowing scalding hot refrigerant and oil to spray out of the terminal. The oil and refrigerant mix ignited

---

[2]"Ohm" is the standard unit of electrical resistance in the International System of Units; an "ohm meter" is an instrument that measures electrical resistance of a material to the flow of current. *Ohm*, Webster's New Int'l Dictionary (3rd ed. 2002); *Ohmmeter*, Webster's, supra.

[3]Christopher Lucas, chair of the HVAC program at Texas State Technical College, testified that the resistance between the compressor windings and the compressor shell should measure "in the millions and millions and millions of ohms or infinity. . . . [I]n other words, . . . you don't want there to be a path for the electricity to . . . touch the casing of the compressor."

and covered Johnson in flames. As a result, Johnson suffered second- and third-degree burns on over sixty percent of his body.

Importantly, a competitor of Emerson's in the HVAC compressor market includes warnings with its compressors to "[b]e alert for sounds of arcing[,] sizzling, sputtering, or popping inside the compressor" and to immediately step away if such sounds are heard. However, the Emerson compressor Johnson installed at the Miller Food Mart did not include such warnings.

### III. The HVAC Unit Is Not Connected to Its Power Source When Terminal Venting Occurs.

According to Johnson, before removing the terminal's cover, he turned off power to the HVAC unit by pulling out the fuse disconnect.[4] Morris initially told fire investigators—on the day of the incident, while he was at Parkland Hospital's burn unit with his uncle—that he thought Johnson had left the main disconnect in the HVAC unit. But, Morris also stated that he thought there was no power to the Emerson compressor because he and Johnson removed some of its wires and that he did not understand how the compressor could have exploded when it did not have power connected to it. When firefighters arrived at the scene after the terminal

---

[4]At trial, counsel and witnesses referred to this part as "the fuse disconnect," the "fuse box," the "fuse disconnect box," and the "main disconnect." The term "main disconnect" was also used to describe the part of the unit that the fuse disconnect plugs into. Whatever term was used, it was used to refer to a part that, when removed, disconnects the HVAC unit from a power source.

5

venting, they found the fuse disconnect sitting atop the HVAC unit, where Johnson said he left it.

## IV. Johnson Sues Fusite and Emerson.

Johnson sued Fusite and Emerson, asserting claims of design defects and marketing defects based in negligence and strict products liability, failure to correct dangerous and hazardous conditions, and gross negligence. The Insurance Company, the insurer of Miller Food Mart, intervened.

At trial, Johnson relied on expert testimony from Dr. Don Russell, an electrical engineer and distinguished professor at Texas A&M University. Dr. Russell holds over twenty patents, including patents on protection systems for electrical power systems. At Texas A&M, he teaches classes on design, and he has conducted extensive research on failed electrical circuits. Prior to trial, Fusite and Emerson filed a motion to exclude Russell's testimony. They objected to Dr. Russell on several grounds, arguing that: (1) his opinions on the propriety of Johnson's HVAC installation and services procedures should be excluded because he lacked expertise and supporting data; (2) his hypotheses about the cause of ignition were not grounded on underlying scientific principles, research, and methodology; (3) his opinions regarding Johnson's potential response to additional warnings if Emerson had provided them were speculative; (4) his opinion regarding alternative designs was inadmissible as it was undeveloped and untested; and (5) he did not have adequate

expertise to opine about the design of HVAC compressors. The trial court denied the motion.

Some of Johnson's claims were resolved by summary judgment and directed verdict or were not otherwise pursued. At the charge conference, Fusite and Emerson objected to several questions in the charge and requested the submission of several instructions, all of which the trial court overruled or denied. The jury was ultimately charged on Johnson's strict products liability design defect claims against Fusite and Emerson; his strict products liability marketing defect claims against Emerson; Fusite and Emerson's defensive issue of Johnson's contributory negligence; the proportionate responsibility of Emerson, Fusite, and Johnson; and damages.

## V. The Jury Finds in Favor of Johnson.

The jury found in favor of Johnson on all of his liability claims. Specifically, the jury found: (1) the Fusite terminal had a design defect that was a producing cause of the occurrence or injury; (2) the Emerson compressor had two design defects—the absence of a system for monitoring the electric current to the pins or for monitoring their temperature and the absence of a permanent guard on the Emerson compressor housing—that were producing causes of the occurrence or injury; and (3) a defect in the Emerson compressor's warnings or instructions was a producing cause of the occurrence or injury. The jury also found that Johnson was contributorily negligent in causing the occurrence or injury and that the proportionate responsibility of Fusite, Emerson, and Johnson was 15%, 75%, and 10%, respectively.

7

The jury awarded Johnson:

- $2,000,000 in past physical pain damages;

- $750,000 in future physical pain damages;

- $2,000,000 in past mental anguish damages;

- $3,000,000 in future mental anguish damages;

- $158,129 in past loss of earning capacity;

- $584,794 in future loss of earning capacity;

- $3,000,000 in past disfigurement damages;

- $500,000 in future disfigurement damages;

- $750,000 in past physical impairment damages;

- $250,000 for future physical impairment damages;

- $727,851 for past medical and health care expenses; and

- $2,579,000 for future medical and health care expenses.

The trial court rendered judgment on the verdict. In accordance with the jury's proportionate responsibility findings, the trial court reduced the jury's award to Johnson by ten percent. In total, the trial court's judgment awarded Johnson $14,669,796.60 in damages, with Emerson liable for the full amount and Fusite jointly

and severally liable for fifteen percent of that amount. The trial court further ordered

that the Insurance Company recover $18,298.11 from Fusite and Emerson.[5]

## DISCUSSION

### I. Fusite and Emerson Challenge the Jury's Liability Findings Against Them and the Corresponding Jury Questions.

In their first issue, Fusite and Emerson challenge the legal and factual

sufficiency of the evidence supporting the jury finding against Emerson on Johnson's

marketing defect claim. In the second issue, they contend that the jury charge on that

claim is erroneous. In their next three issues, Fusite and Emerson challenge the jury's

findings on Johnson's design defect claims, complaining that Dr. Russell's testimony

was inadmissible, that the evidence was legally and factually insufficient, and that the

related jury charge was erroneous.

#### A. Johnson's Claims Are Grounded in Strict Products Liability Law.

A "defective product" is a product that is unreasonably dangerous to the user

or consumer. Restatement (Second) of Torts § 402A(1); *Sims v. Washex Mach. Corp.*,

932 S.W.2d 559, 561–62 (Tex. App.—Houston [1st Dist.] 1995, no writ); *see also Borel

v. Fibreboard Paper Prod. Corp.*, 493 F.2d 1076, 1087 (5th Cir. 1973). A plaintiff may

prove a product "defective" by showing it is (1) unreasonably dangerous as

---

[5]Prior to trial, the parties stipulated the Insurance Company incurred $18,298.11 in damages under its policy with the Miller Food Mart.

9

manufactured,[6] (2) unreasonably dangerous as designed, or (3) unreasonably dangerous because adequate warnings or instructions were not provided.[7] *Joseph E. Seagram & Sons, Inc. v. McGuire*, 814 S.W.2d 385, 387 (Tex. 1991); *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 377 (Tex. 1984).

A product with a design defect complies with all design specifications, but the design configuration is unreasonably dangerous in that the risks of harm associated with its intended and reasonably foreseeable uses outweigh its utility. *USX Corp. v. Salinas*, 818 S.W.2d 473, 482 n.8 (Tex. App.—San Antonio 1991, writ. denied). In contrast, a marketing defect occurs when a defendant knows or should know of a potential risk of harm presented by a product but markets it without adequately warning of the danger or providing instructions for safe use. *Id.* at 482.

A product need not be proven defective in all three ways in order to sustain a finding of strict liability. *Sims*, 932 S.W.2d at 562.

---

[6]Manufacturing defects are not an issue in this case.

[7]Courts also refer to marketing defect claims as "failure-to-warn" claims. *See, e.g.*, *Hanus v. Tex. Utils. Co.*, 71 S.W.3d 874, 878 (Tex. App.—Fort Worth 2002, no pet.); *see also Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 426 (Tex. 1997) ("A defendant's failure to warn of a product's potential dangers when warnings are required is a type of marketing defect.").

**B.    The Evidence Sufficiently Supports the Jury's Findings on Johnson's Marketing Defect Claims Against Emerson, and the Jury Charge Is Not Erroneous.**

We initially address the jury's findings in favor of Johnson on his strict liability marketing defect claims against Emerson.

**1.    The Evidence Sufficiently Supports the Jury's Finding that a Defect in the Compressor's Warnings or Instructions Regarding the Risk of Terminal Venting Was a Producing Cause of Johnson's Injuries.**

**a.    We Apply the Familiar Sufficiency Standards of Review.**

Fusite and Emerson's legal sufficiency challenge to the jury's marketing defect finding can only be sustained if:  (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.  *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999).  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

11

Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

Fusite and Emerson also face a demanding burden in challenging the factual sufficiency of evidence supporting the jury's finding. When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

### b.   Strict Products Liability Marketing Defect Claims Have Five Elements.

Even a product which is safely designed and manufactured may be unreasonably dangerous as marketed because of a lack of adequate warnings or instructions. *McGuire*, 814 S.W.2d at 387; *Malek v. Miller Brewing Co.*, 749 S.W.2d 521, 522 (Tex. App.—Houston [1st Dist.] 1988, writ denied). Under a marketing defect

12

theory, it is the absence of an adequate warning or instructions that makes use of the product unreasonably dangerous. *Sims*, 932 S.W.2d at 562; *see also Ethicon Endo-Surgery, Inc. v. Meyer*, 249 S.W.3d 513, 516 (Tex. App.—Fort Worth 2007, no pet.) ("A marketing defect occurs when a defendant knows or should know of a potential risk of harm presented by the product but markets it without adequately warning of the danger or providing instructions for safe use.").

To establish a strict products liability marketing defect claim, a plaintiff must prove the following elements:

> 1.  a risk of harm is inherent in the product or may arise from the intended or reasonably anticipated use of the product;
>
> 2.  the product supplier actually knew or should have reasonably foreseen the risk of harm at the time the product was marketed;
>
> 3.  the product contains a marketing defect;
>
> 4.  the absence of a warning and/or instructions renders the product unreasonably dangerous to the ultimate user or consumer of the product; and
>
> 5.  the failure to warn and/or instruct must constitute a causative nexus in the product user's injury.

*Salinas*, 818 S.W.2d at 482–83; *see also Ranger Conveying & Supply Co. v. Davis*, 254 S.W.3d 471, 480 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

Sellers have no duty to warn of "open and obvious" defects in strict products liability failure-to-warn claims. *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 382 (Tex. 1995); *Beans v. Entex, Inc.*, 744 S.W.2d 323, 325 (Tex. App.—Houston [1st Dist.] 1988,

writ denied) (upholding summary judgment against a plaintiff on the basis that the danger was open and obvious and the defendant therefore had no duty to warn of it); *see also Sauder Custom Fabrication Inc. v. Boyd*, 967 S.W.2d 349, 350–51 (Tex. 1998) (holding that (1) the duty to warn applied only to risks not known to a product's consumer and (2) "consumer" means "an ordinary user of the product, not necessarily . . . an ordinary person unfamiliar with the product."). Thus, "[w]hen the foreseeable users of a product have special training, a supplier has no duty to warn of risks that should be obvious to them, even if persons without such training would not appreciate the risks." *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 183 (Tex. 2004). As a result, in looking at whether the defendant owed a duty to warn, a court looks not at whether the risk would be obvious to an ordinary person or to the specific plaintiff, but at whether such risk would be obvious to an ordinary, foreseeable[8] user of the product. *Sauder*, 967 S.W.2d at 350–51.

In sum, a defendant need not warn either of (1) dangers that would be obvious to the ordinary user, as opposed to the ordinary person who may not be familiar with the product, or (2) dangers that are common knowledge in the community.[9] The

---

[8]In discussing the duty to warn, *Sauder* uses the terms "ordinary user" and "average user," while *Humble Sand* and the Restatement (Third) use the term "foreseeable user." *Humble Sand*, 146 S.W.3d at 183; *Sauder*, 967 S.W.2d at 351; Restatement (Third) of Torts: Prod. Liab. § 2, cmt. i. (1998). We use these terms interchangeably.

[9]The Supreme Court of Texas has not defined what constitutes the "community" for purposes of determining what knowledge is generally known. Case

determination of whether a risk is obvious or commonly known is an objective standard. *Id.* at 350.

### c. Johnson's Training and Experience Did Not Negate the Need for a Warning Regarding Terminal Venting.

Fusite and Emerson contend that the evidence does not support the jury's finding against Emerson on Johnson's strict products liability marketing defect claim regarding the absence of adequate warnings or instructions of the terminal venting risk because: (1) Emerson had no duty to warn Johnson, an HVAC professional, about the risk of terminal venting; (2) Johnson already knew about that risk; and (3) therefore, there was no product defect or causation as to him.

law generally suggests that the "community" a court must reference is a community of the ordinary users of the product, although for some products, "community" includes the public at large, even if some members of the public do not use the product. *See Grinnell*, 951 S.W.2d at 427, 431 (discussing the community's knowledge about nicotine addiction, stating that common knowledge "connotes a general societal understanding" of the risks of a product, but more specifically considering the knowledge attributable to the community of smokers); *cf. McGuire*, 814 S.W.2d at 388 ("Texas courts have recognized that there is common knowledge *among the public* . . . that intoxicating liquor can . . . impair the ability of the imbiber to operate a motor vehicle."); Restatement (Third) of Torts: Products Liability § 2 cmt. j (1997) ("In general, a product seller is not subject to liability for failing to warn or instruct regarding risks . . . that should be . . . *generally known by . . . foreseeable product users.*" (emphasis added)). In some cases, what makes a danger obvious to the ordinary user of a product—the user's knowledge and training—will also be what makes the danger commonly known in the community of ordinary users. *See, e.g., Sauder*, 967 S.W.2d at 351 ("No ordinary person trained to do the work Boyd and his crew were doing could have failed to appreciate the obvious risk."). Thus, in cases in which the danger would be obvious or commonly known only because of specialized training or education, these two exceptions to the duty to warn will more or less collapse into one.

Johnson's marketing defect theory about the terminal venting was that Emerson should have warned him about the risks of terminal venting, specifically, the nature of its danger and how to avoid it. As part of this theory, Johnson argued that Emerson should have warned that certain noises indicate that a terminal vent is imminent, so that a serviceperson who heard the noises would recognize the immediate danger and avoid it. *See* Restatement (Third) of Torts: Prod. Liab. § 2 (stating that a product has a marketing defect from a lack of adequate instructions or warnings "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings" and the lack of warning makes the product not reasonably safe). In response to this theory, Fusite and Emerson asserted that Emerson had no duty to warn Johnson about the risk of terminal venting because: (1) Johnson, an experienced HVAC technician, was a sophisticated user for whom the risk of terminal venting should have been foreseeable and (2) Johnson actually knew of the risk of terminal venting and therefore did not need any warning. Johnson's position at trial was that what the noises coming from the Emerson compressor indicated is neither obvious nor commonly known in the community, and if he had been warned that the noises he heard indicated the compressor was in fact about to vent through its terminal, he could have avoided harm. After exhaustively examining the record, we hold that Johnson produced more than a preponderance of evidence to support his position, and the evidence was not so contrary to the overwhelming weight of all the evidence

16

that the jury's finding should be set aside. *See Cont'l Coffee*, 937 S.W.2d at 450; *Pool*, 715 S.W.2d at 635.

### (i) Johnson's Evidence Supported His Duty-to-Warn Theory.

Both Johnson and Morris testified at trial they heard sounds coming from the Emerson compressor prior to the terminal vent.

Johnson testified that when he arrived at the Miller Food Mart on August 3, he replaced the fuses, but the HVAC unit still would not run. Morris went downstairs to the store to check the electric breaker and had to flip it back on. This allowed the HVAC unit to start, at which point Johnson heard a noise. Johnson described it as a rumbling sound, "an unusual noise." "It didn't sound threatening or serious or anything," and so he "figured [they] could track it down." He began trying to isolate the sound. After he removed power to the HVAC unit's two compressors, the noise stopped, which told him the noise was coming from one of the compressors. Johnson reconnected the new Emerson compressor, and the noise started again, which told him the newly-installed compressor was making the noise. He testified that he then removed the compressor's fuse box and the compressor's terminal cover to get an ohm reading. Before Johnson had a chance to get that reading, the Emerson compressor vented through its terminal.

Johnson told the jury that he did not know what the noises signified and if he had known the noises meant the Emerson compressor was about to vent, he would

17

have acted differently, including allowing the compressor to cool down before trying to work on it. Johnson explained, "[T]he noise was—to me, when I walked up to it, you have to determine is this noise a kitten—you know, a meow from a kitten, or is it a pit bull." "If [the noise] is a kitten, you have time to search [for] the problem. But if it was sounding, you know, very dangerous, then, of course, no."

Reinforcing Johnson's testimony, Morris testified that he also heard noises coming from the Emerson compressor. At one point after the incident, he reported that he had heard popping sounds prior to the vent. At trial, Morris said the noise he heard was "hard to describe," "some kind of thud or something," and "nothing [he] ever heard before."

The evidence at trial showed, and the parties do not dispute, that the noises did, in fact, indicate that the compressor was about to vent. Johnson introduced into evidence the service handbook for a compressor made by a competitor of Emerson's. In a section dedicated to terminal venting appears the warning: "To reduce the risk of electrocution or serious burns or death from terminal venting with ignition: . . . *Be alert for sounds of arcing (sizzling, sputtering[,] or popping) inside the compressor. IMMEDIATELY GET AWAY if you hear these sounds.*"

### (ii) Fusite and Emerson's Evidence Supported Johnson's Duty-to-Warn Theory.

Evidence provided at trial by witnesses representing Fusite and Emerson further supported Johnson's duty-to-warn theory. Even though Ken Monnier, Vice

President of Engineering for Emerson, testified that he did not think it would be appropriate for Emerson to provide a warning like its competitor because the HVAC units in which Emerson compressors are installed generate louder noise than the HVAC units in which its competitor's compressors are installed (implying that a user of Emerson's compressor would not be able to hear the tell-tale signs of an imminent terminal vent, and therefore a warning about the noise would be unnecessary and useless), Monnier did not provide a basis for this implication. In fact, Monnier offered no testing or other data showing that such a noise could not be heard either over a running HVAC unit with an Emerson compressor or an HVAC unit with an Emerson compressor that was being serviced and was disconnected from a power source, and he acknowledged that Johnson and Morris both heard a noise.

Further, John Gephart, Jr., a retired Emerson employee and current consulting engineer for Emerson, agreed that Emerson does not provide warnings or instructions to servicepersons regarding terminal venting which inform them that they should be alert for sounds coming from inside the Emerson compressor or to get away from the compressor if they hear such sounds. According to Gephart, "It would be possibly a good idea to do it." Gephart did not know that such sounds indicated an imminent terminal vent. When he was asked whether, if Emerson knew that such sounds meant that a terminal vent is imminent, it should provide that information to servicepersons, he responded, "We should." Indeed, Gephart stated that Emerson does not provide any warnings about the dangers associated with

19

terminal venting since "we've not considered it to be a big issue because we have very few instances of it in the field."

In addition, Fusite and Emerson called Christopher Lucas, chair of the HVAC program at Texas State Technical College, to testify about standard training for HVAC servicepersons. He testified that he did not know that sounds like sizzling, sputtering, and popping signal that a compressor is about to vent through its terminal.

### (iii) The Evidence Does Not Show that Johnson Knew of the Terminal Venting Risk Before His Injury.

Despite the testimony of their own witnesses supporting a duty to warn, Fusite and Emerson now argue that the evidence shows that Johnson knew that the compressor's internal pressure created a risk of venting, as Morris testified that Johnson warned him not to stand in front of the Emerson compressor because compressors can terminally vent.[10] However, Morris's testimony in context shows only that Johnson was aware that it is possible for compressors to vent in some circumstances. Neither this part of Morris's testimony nor his testimony as a whole shows that Johnson was aware that the Emerson compressor in this case was actually about to vent through the terminal. In fact, Morris's testimony shows the opposite.

_____

[10]Morris testified about where this conversation took place—the Miller Food Mart—but he did not say when or on what day it occurred or if Johnson said this about any particular compressor. Johnson testified that he had told Morris that pins could shoot out, but he was not asked when this conversation occurred, and he also testified that he believed the risk of venting was associated primarily with a type of compressor older than the Emerson compressor at issue.

20

And, the warning that Johnson contended Emerson should provide was not merely that compressors can vent in some circumstances. Rather, Johnson contended that Emerson should warn of the dangers of venting *and how to avoid those dangers.* Obviously, knowing that an event may happen in some circumstances is quite different from knowing that the event is about to occur, and Johnson's position at trial was that Emerson should have warned about the risks the noises represented.

In summary, Johnson put on evidence at trial that certain noises signify an imminent terminal vent and that such noises occurred in this case. Regardless of whether Johnson or the community of HVAC servicepersons knew that compressors can vent in some circumstances, the evidence at trial established that it is not commonly known or obvious that if the serviceperson hears certain noises, venting is no longer a theoretical possibility but an imminent occurrence. Johnson's testimony showed that he did not have this knowledge. We therefore cannot say that because the danger was obvious, commonly known, or actually known, Emerson had no duty to provide the kind of warning Johnson asserted it should provide.

### d. Fusite and Emerson's Causation Argument is Without Merit.

In two short paragraphs under their first issue, Fusite and Emerson also make a conclusory argument (with no citations to authority) that because Johnson was aware of the risks of terminal venting, he could not show causation. This argument is unconvincing.

21

To prove causation in a marketing defect claim, "[a] plaintiff must show that adequate warnings would have made a difference in the outcome, that is, that they would have been followed." *Gen. Motors Corp. v. Saenz*, 873 S.W.2d 353, 357 (Tex. 1993). However, because of the difficulties of proving causation, the law provides a rebuttable presumption, arising when the defendant provided no warning, that the plaintiff would have read and heeded an adequate warning, and the same presumption arises when a defendant provided an inadequate warning that failed to give the plaintiff information that might have prevented the harm or injury that occurred. *Id.* at 359.

As we have said, even if the evidence showed that Johnson was aware of the possibility that the compressor *could* vent, the evidence showed that he did not know that a terminal vent was actually about to happen and did not know that the noises he heard were warnings of that imminent danger. We cannot say that Fusite and Emerson negated causation by reference to Johnson's knowledge. And Johnson testified that he would have reacted differently had he known what the noises he heard meant, including letting the compressor cool before performing further work. Fusite and Emerson point to no evidence in the record to refute that testimony.

More importantly, in their initial brief, Fusite and Emerson neither mention the presumption arising from the failure to provide adequate instructions nor argue why it did not apply or how the evidence rebutted the presumption. *See id.* Johnson argued at trial that Emerson needed to provide a warning that would have informed him of

22

the fact that the noises he heard meant that the compressor was about to vent so that he could avoid the danger. It is undisputed that Emerson did not provide any such warning and provided no explicit warnings about terminal venting. The Emerson compressor displayed a symbol meant to warn of the general possibility of explosions, but it did not include any warning specifically about terminal venting or how to avoid dangers from a terminal vent. We have upheld the trial court's determination that Emerson had a duty to provide Johnson with a warning that would have enabled him to avoid harm and the jury's finding that it failed to do so; the presumption therefore applied unless Emerson rebutted the presumption. *See id.* Stated again, when the presumption is not rebutted, the law presumes causation. *Id.* Yet Fusite and Emerson made no mention of this presumption in their opening brief.

Fusite and Emerson address the presumption briefly in their reply brief, arguing that they gave some warning (a warning to wear goggles and a symbol meant to indicate that an explosion could happen) and asking us to determine that the evidence negated the presumption. However, they waived their arguments by failing to raise them in their opening brief and failing to cite any authority to support their argument that they rebutted the presumption. *See Pineridge Assocs., L.P. v. Ridgepine, LLC*, 337 S.W.3d 461, 472 n.10 (Tex. App.—Fort Worth 2011, no pet.) (holding an appellant waives consideration of a contention the appellant raises for the first time in a reply brief); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–

85 (Tex. 1994) (citing Tex. R. App. P. 38.1 and recognizing long-standing rule that error may be waived through inadequate briefing).

### e. We Uphold the Jury Verdict on Johnson's Marketing Defect Claim Based on Emerson's Failure to Warn of the Risk of Terminal Venting.

The evidence is legally and factually sufficient to show that: (1) Emerson had a duty to warn Johnson of the risk of an imminent terminal vent should he hear the Emerson compressor emit unusual noises, a risk he was unaware of despite his expertise and a risk that is not obvious in the HVAC community; (2) Emerson failed to provide such warning; and (3) Emerson's failure to warn of the risk of the imminent terminal vent was a producing cause of Johnson's injuries. Fusite and Emerson do not otherwise challenge the sufficiency of the evidence supporting the jury finding on Johnson's claim based on the failure to warn of the imminent venting risk.

Because the single jury finding on the failure-to-warn claim regarding imminent venting could alone support the jury's finding Emerson liable, we need not address whether Emerson had a duty to warn about the need to conduct electrical checks, whether the lack of a warning about electrical checks made the compressor unreasonably dangerous, or whether the evidence supports a finding of causation from the lack of a warning about electrical checks. *See* Tex. R. App. P. 47.1. Thus, we overrule Fusite and Emerson's first issue.

24

## 2. The Jury was Correctly Instructed Regarding Johnson's Marketing Defect Theory Grounded in Emerson's Failure to Warn of the Risk of Imminent Venting.

In their second issue, Fusite and Emerson argue that the jury charge was erroneous on Johnson's strict products liability marketing defect claims because it wrongly treated Johnson as unsophisticated. We address this issue only as to the claim alleging Emerson's failure to warn of the terminal venting risk. *See id.* Fusite and Emerson point out that the jury was instructed that a product is unreasonably dangerous if it is dangerous to an extent beyond that contemplated by "the ordinary user" with the ordinary knowledge common to the community and that instructions are adequate when they are comprehensible to "the average user" and convey an indication of the danger to the mind of "a reasonably prudent person." Although these instructions provided to the jury follow the Texas Pattern Jury Charge for strict products liability claims, Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises & Products* PJC 71.5 (2016), Fusite and Emerson contend that these instructions "lower the bar" because "Johnson was no ordinary user," and the instructions fail to let the jury account for Johnson's training and experience.

Instead, Fusite and Emerson further contend that the trial court should have given the jury this instruction:

> When the foreseeable users of a product have special training, a supplier has no duty to warn of risks that should be obvious to them, even if persons without such training would not appreciate the risks.

25

According to Fusite and Emerson, this instruction—and not the standard instruction—should have been given by the trial court because it is in line with the holding of the Texas Supreme Court in *Humble Sand & Gravel, Inc. v. Gomez*. We disagree.

There are several problems with Fusite and Emerson's contention. *First*, *Humble Sand* is easily distinguishable. Unlike this case, *Humble Sand* focused on whether a supplier has a duty to warn third parties—its customers' employees—not, as here, on whether a distributor has a duty to warn its own customers. *Humble Sand*, 146 S.W.3d at 194–95.

*Second*, *Humble Sand* does not require the jury instruction requested by Fusite and Emerson, nor does it conflict with the instructions given in this case. That case focused on the issue of duty (specifically the duty of silica suppliers to provide warnings) and did not analyze what instructions should be given to the jury in marketing defect cases. *See id.* at 182.

*Third*, assuming that instructing the jury regarding duty would have been acceptable in the context of this case,[11] it was unnecessary, as the instructions to which Fusite and Emerson objected essentially gave the jury the same information. The instructions told the jury that a product was unreasonably dangerous if it was

---

[11]As Fusite and Emerson acknowledge in their brief under their first issue, the jury usually should not be asked to determine a defendant's duty in a marketing defect case. *See Seifried v. Hygenic Corp.*, 410 S.W.3d 427, 431 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (noting that whether a legal duty to warn exists is a question of law).

26

dangerous beyond the contemplation of the ordinary user. Here, the instructions did not instruct the jury to consider what dangers would be contemplated by the average person. Rather, as we discussed above, the average or ordinary user of a product is not necessarily the same as an ordinary *person.* Contrary to the contention of Fusite and Emerson, the only evidence at trial was that Johnson *was* in fact an **ordinary** user of an HVAC compressor.[12] The instructions the trial court gave to the jury in this case specifically take into consideration the specialized training of the compressor's ordinary user and do not "wrongly lower the bar."

*Fourth*, the requested instruction on duty would not have helped Fusite or Emerson because the evidence shows that foreseeable users with the specialized training relevant in this case do not know that certain noises warn of an imminent terminal vent. Thus, the jury, had it been specifically instructed to consider the specialized training of HVAC servicepersons, would have had to consider the undisputed evidence that this information was not commonly known. Even if the trial court did err, on this record, we cannot say that the exclusion of the requested instruction was harmful. *See* Tex. R. App. P. 44.1; *Reinhart v. Young*, 906 S.W.2d 471, 473 (Tex. 1995) (explaining jury charge error is reversible only if it was reasonably calculated to and probably did cause the rendition of an improper judgment); *Lone*

---

[12]Fusite and Emerson acknowledge in their brief that Johnson was an ordinary user of an HVAC compressor when, arguing about the duty to warn under their first issue, they assert that service work on commercial HVAC units like the one at the Miller Food Mart should only be performed by trained personnel like Johnson.

*Star Gas Co. v. Lemond*, 897 S.W.2d 755, 756 (Tex. 1995) (holding any error in instructing the jury in a marketing defect case was harmless).

We hold that the trial court did not abuse its discretion in its rulings on Fusite and Emerson's requested instruction and objection to the charge. *See Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 727 (Tex. 2016) (reviewing a trial court's jury-charge rulings for abuse of discretion).

We overrule Fusite and Emerson's second issue.

## C. The Evidence Sufficiently Supports the Jury's Finding on Johnson's Design Defect Claim Against Fusite, Dr. Russell's Testimony Was Properly Admitted, and the Jury Charge Was Not Erroneous.

In their third, fourth, and fifth issues, Fusite and Emerson contend that: (1) the trial court erred in allowing the plaintiff's expert to testify about what a design defect is; (2) the evidence is legally and factually insufficient to support the findings of liability on the design defect theories; and (3) the jury charge was erroneous as to the design defect theories. Because we have already upheld the jury's finding Emerson liable on Johnson's marketing defect claim based on its failure to warn of an imminent vent, we address these three issues only in terms of the claims, evidence, and design defect finding against Fusite. *See* Tex. R. App. P. 47.1.

### 1. Sufficient Evidence Supports the Jury's Design Defect Finding Against Fusite.

The jury found that at the time the Fusite terminal left Fusite's possession, it had a design defect that was a producing cause of the occurrence or injury in question.

28

In their fourth issue, Fusite and Emerson challenge the jury's finding that the Fusite terminal had a design defect. They argue that there is no evidence of a safer alternative design for the Fusite terminal because there is no evidence that Fusite's 700 series terminal would have prevented or significantly reduced the risk of Johnson's injury. This is a challenge to the legal sufficiency of the evidence supporting the jury's finding. *See In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014) ("Our traditional legal sufficiency—or 'no evidence'—standard of review upholds a finding supported by '(a)nything more than a scintilla of evidence.'"). We therefore look to see if more than a scintilla of evidence supports the jury's finding, considering evidence favorable to the jury's finding unless a reasonable jury could not and disregarding evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix*, 228 S.W.3d at 651. We hold that there was some evidence to support the jury's finding that Fusite's 700 series terminal is a safer design alternative to the Fusite terminal used in the Emerson compressor.

### a. Defective Design Liability Requires a Showing of a Safer Alternative Design.

"In determining whether a product is defectively designed, the jury must conclude that the product is unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use." *Grinnell*, 951 S.W.2d at 432. In evaluating a product's risk and utility, Texas courts have considered, among other factors, "the availability of a substitute product which would

29

meet the same need and not be unsafe or unreasonably expensive."[13]  *Id.*  The Texas

Legislature codified this "safer alternative" requirement of design defect claims in

Section 82.005 of the Texas Civil Practice and Remedies Code.  Tex. Civ. Prac. &

Rem. Code Ann. § 82.005.  Under that section, if a plaintiff's products liability claim

alleges a design defect, the plaintiff must prove by a preponderance of the evidence

that "(1) there was a safer alternative design; and (2) the defect was a producing cause

of the personal injury . . . for which the claimant seeks recovery."  *Id.* § 82.005(a).  The

statute defines "safer alternative design" to mean a product design that in reasonable

probability:

---

[13]The five factors of risk and utility that Texas courts consider in design defect cases are:

> (1) the utility of the product to the user and to the public as a whole weighed against the gravity and likelihood of injury from its use; (2) the availability of a substitute product which would meet the same need and not be unsafe or unreasonably expensive; (3) the manufacturer's ability to eliminate the unsafe character of the product without seriously impairing its usefulness or significantly increasing its costs; (4) the user's anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions; and (5) the expectations of the ordinary consumer.

*Grinnell*, 951 S.W.2d at 432.  Regardless of whether a plaintiff must establish each factor to recover, *see Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.*, 848 S.W.2d 724, 732 (Tex. App.—Dallas 1992, writ denied) (stating that a plaintiff need not prove up every factor), proof of a safer alternative design is required.  Tex. Civ. Prac. & Rem. Code Ann. § 82.005(a) (West 2017).

(1) would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and

(2) was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.[14]

*Id.* § 82.005(b); *see also* Restatement (Third) of Torts: Prod. Liab. § 2 (stating that a product has a design defect "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor . . . and the omission of the alternative design renders the product not reasonably safe").

Here, Johnson alleged that Fusite manufactures a terminal that satisfied these requirements and that it did so at the time the terminal used in the Emerson compressor left Fusite's control. Fusite and Emerson do not contend on appeal that the safer alternative design Johnson relied on was not economically or technologically feasible. Rather, they focus on the first part of the definition of "safer alternative design," arguing that Johnson did not show that a proposed safer alternative would have prevented or significantly reduced the risk of his injury.

### b. Johnson's Safer Design Alternative Was the Fusite 700 Series.

The Fusite terminal used in the Emerson compressor was from Fusite's 600 series of terminals. At trial, Johnson produced evidence about a different series

---

[14]The jury charge tracked this statute.

31

of Fusite terminals, the 700 series, which he contended was a safer alternative design. Johnson's theory was based on testing in which the 600 series vented, but the 700 series did not. Fusite and Emerson disputed the applicability of that study, arguing that the study showed a difference only when the pins in the terminals being tested had a solid stainless steel core, and there is no evidence that the 700 series had a lower risk of terminal venting than the 600 series when copper-core pins are used, as they were in the Fusite terminal that vented in this case.

### c. Johnson Produced Sufficient Evidence of a Safer Design.

Fusite produced a 500 series of terminals that used straight conductor pins. In the 600 series and the 700 series terminals, Fusite uses grooved pins. Fusite documentation discussing the terminal pins refers to this groove as a fuse-like link because, though not actually a fuse, the groove acts as the equivalent of a fuse: before the pins overheat enough to melt the glass they sit in, the pins burn through at the groove, opening the circuit and cutting the terminal (and thus the attached compressor) off from its power source. In the 600 series, that groove is on the part of the pin that sits *inside* the compressor shell. In the 700 series, that groove is on the part of the pin that lies *outside* of the compressor shell.

Dr. Russell testified that having the groove on the outside of the compressor is a safer design alternative. Fusite and Emerson assert that Dr. Russell's opinion relied on Fusite's testing and that the testing did not support the jury's finding. Fusite

32

conducted several tests on its 600 series and 700 series terminals. Some of those tests showed that the 700 series terminals were far less likely to vent than the 600 series terminals, and Dr. Russell discussed that testing data at trial, describing the 700 series as "substantially" outperforming the 600 series. In one of those tests, "the 700 series . . . never showed a loss of integrity between the pin and the glass or a loss of the pin." And, an internal Fusite memo described the 700 series as having performance enhancements compared to the 600 series.

But, Fusite and Emerson argue, the terminals in that testing used pins with stainless steel cores. They point out that Fusite also did testing using terminals with pins that had copper cores, like the pins in the Fusite terminal that vented in this case, and they argue that there was no difference between the 600 series and the 700 series in those tests—none of the terminals with the copper-core pins in either series vented in Fusite's testing. Fusite elicited testimony on that point at trial.

Fusite and Emerson's argument understates the evidence supporting the jury's finding. *First*, Dr. Russell's opinion testimony did more than just cite Fusite's testing data. Rather, Dr. Russell explained *why* putting the pin's groove on the outside of the compressor is safer than having the groove on the inside:

> [I]nside of the compressor . . . is . . . where we have pressure and we have our fluids. . . . When this [groove] burns through, it is on the inside of the compressor which means we have a heating, a burning and a separation of load which implies also an [electrical] arc that's going to occur on the inside of the compressor where the very fluids are and the pressure is and other things going on, right?

33

I consider that not a good idea. You don't want to be creating an intentional separation and an arc and heating and so forth on the inside. By having it on the outside of the compressor, the same effect is achieved by having [the groove part of the pin] burn through when you have too much current that would be coming in.

At the same time, this is on the outside, so you are not inside the compressor, you are not heating up the fluid, you are not creating an arc inside, you're not doing those things I talked about a while ago. So in that sense alone, I believe it's a superior design to have the fused element be placed on the outside of the compressor.

He added, "All of this [the rest of the compressor] would remain integral structurally,

structural integrity would not be compromised." He further testified,

Whereas in the 600 [series] we have the problem again, it's under pressure. [The groove] is on the inside of the—where the oils and fluids and so forth are, it is arcing, and it is also affecting this—would affect part of this ceramic glass and part of the area where you are trying to hold on to the . . . pin.

So by appropriately removing the fuse completely away from any of the glass structure in any sense and not having it associated with the fluids, I believe you have a superior design.

. . . .

[I]f [burning through the groove] disconnects the power on the outside, any separating arc that might occur when the conductors separate would simply be benign because it's on the outside, whereas on the inside it is contributing to the bad things that are happening inside the compressor.

. . . .

I believe that the 700 series design will have superior design, will have superior performance leading to less terminal venting with the properly designed external fuse.

34

*Second*, Fusite and Emerson try to limit the reading of their testing data, but the jury did not have to accept their interpretation. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Fusite and Emerson are correct that the jury had evidence that copper-core pins carry electrical current more efficiently than stainless-steel-core pins and are consequently far less likely to lead to a terminal vent than are stainless-steel-core pins. But what happens when copper-core pins *do* overheat? Here, as the jury knew, having copper-core pins in the Fusite terminal did not stop a terminal vent. Rather, the jury had to consider whether, given that known outcome, the risk of a terminal vent would have been substantially reduced by having the pins' fuse-like groove on the outside of the compressor shell. The jury had evidence that copper-core pins are less likely to overheat but, all other things being equal, *if* a terminal's pins overheat (as they did in this case), having the groove on the outside of the compressor is less likely to lead to a terminal vent than having the groove on the inside. While some of Fusite's testing showed that copper-core pins were less likely to overheat in the first place, that testing did not discount Fusite's other testing showing that when terminal pins *do* overheat (as the stainless-steel-core pins in the testing did), having the groove outside the compressor substantially reduces the chance of a terminal vent occurring. Dr. Russell also interpreted the testing data that way, testifying that "[t]he way I interpreted the data was that there was a substantial difference in the compromise of the integrity of the seal whether the fuse was on the outside or the inside." The jury could have accepted that interpretation. Fusite's

testing data did not contradict Dr. Russell's testimony interpreting that data. It did not contradict Dr. Russell's explanation for why having the groove on the outside of the compressor is safer than having the groove on the inside.

*Third*, Johnson introduced evidence that Dr. Russell's opinion has support in the industry. In 1994, Copeland Company, a compressor company that Emerson subsequently bought,[15] applied for and was ultimately issued a patent for a terminal with grooves on pins outside of the compressor. Johnson introduced the patent at trial. The patent explained why having the groove on the outside of the compressor shell is an improvement over having the groove on the inside: it helps prevent terminal venting. The patent states,

> One problem associated with these prior art terminals is that in response to unexpected abnormally high over[-]current conditions . . . the conductor pins may heat up to the point of melting the conductor pins themselves or the surrounding glass-to-metal seals, thereby resulting in the failure or leaking of the hermetic terminal and thus the hermetic shell [i.e., terminal venting].

> One method for preventing occurrence of [terminal venting] is to use a fuse-like link within the conducive path of each conductor pin. . . . . **When the fuse-like area of the conductor pin is located on the inside** of the shell, this separating of the fuse-like area of the conductor pin effectively disconnects power to the compressor but **it** also **leaves the opportunity for the pin to be pushed out** of the body of the terminal causing the leakage or failure of the hermetic terminal and thus the hermetic shell. . . . Accordingly, there is a need for providing a conductor pin having an integral fuse-like link which maintains the integrity of the hermetic shell upon failure of the fuse-like

---

[15]One witness testified that Fusite acquired Copeland, but three witnesses testified that Copeland was acquired by Emerson.

link. **Preferably, the fuse-like link would also be located on the outside of the shell.** [Emphasis added.]

Thus, in the terminal that is the subject of the patent, the fuse-like groove is located on the outside of the compressor shell. While the patented terminal has other safety features not involved in the 700 series, the patent's language reflects an acknowledgement that having the fuse-like groove on the inside of the compressor shell can create a safety issue.

*Finally*, Johnson produced evidence that at one point, Fusite told its customers that having the fuse-like groove on the outside of the compressor shell was an improvement over having the groove on the inside. Fusite produced a PowerPoint document to show to its customers about the 700 series. The document described the grooved pins of the 600 series and the 700 series as "product enhancements" over the straight pins used in a previous series and the external groove of the 700 series as "performance plus." The document also described the 700 series "design enhancements," such as "**optimizes fuse-like groove performance**," "**provides external current disconnect**," and "**improves groove response time.**" [Emphasis added.] The document additionally described the 700 series as having a 90% improvement in the groove function, that is, in the groove opening and cutting off the power supply. The presentation did not discuss the difference between stainless-core pins and copper-core pins. Thus, Fusite acknowledged at the time of the presentation that an external groove optimizes the fuse-like performance of the

37

groove over an internal groove—or, at least, that is what it told its customers at the time.

Because some evidence supports the jury's finding that the 700 series is a safer design alternative, we will not throw out this finding, and we overrule this portion of Fusite and Emerson's fourth issue.

### 2. Fusite and Emerson's Remaining Arguments About Dr. Russell's Testimony Are Unavailing.

#### a. Fusite and Emerson Did Not Demonstrate that Dr. Russell's Testimony Should Have Been Excluded.

In their third issue, Fusite and Emerson argue that Dr. Russell's testimony should have been excluded because Johnson failed to demonstrate the reliability of the opinion. Some of their arguments under this issue relate to Dr. Russell's opinion about how the compressor contents ignited, an opinion that is not relevant to the terminal design defect theory, as we discuss in more detail below. Nor, as we explained above, do we address their arguments related to the Emerson compressor design defect claim because we have already upheld the jury's finding that Emerson is liable for failing to warn Johnson of the risk of an imminent vent. *See* Tex. R. App. P. 47.1. We will address the remaining arguments under this issue.

##### (i) Dr. Russell Addressed the Relevant Factors of Risk-Utility.

Fusite and Emerson argue that whether a product is defectively designed so as to render it unreasonably dangerous is determined by analyzing the five factors of a

38

risk-utility analysis, that Dr. Russell failed to conduct any risk-utility analysis, that he "failed to . . . inquire whether the challenged product designs were unreasonably dangerous," and that the trial court should have granted their pretrial motion to exclude Dr. Russell's testimony on that basis. *See Grinnell*, 951 S.W.2d at 432 (setting out the five factors of a risk-utility analysis).

Johnson never disputed the utility of HVAC compressors. As for risk, in Dr. Russell's affidavit, attached along with his report to Johnson's response to Fusite and Emerson's motion to exclude, Dr. Russell discussed "the severe and well[-]known hazard of terminal venting." He further discussed the availability of safer alternative designs for the Emerson compressor and the Fusite terminal—specifically noting that "the industry has designed electrical terminals to eliminate or significantly reduce the hazard of terminal venting"; the economic and technical feasibility of his proposed alternatives; and the need for warning about the dangers of terminal venting. In discussing the need for warnings, he noted that an industry group recommends warning of terminal venting, described what that industry group proposes manufacturers include in their warnings, and stated that an Emerson competitor includes those warnings. Dr. Russell therefore addressed the factors that Fusite and Emerson contend he needed to balance in order to determine that the Emerson compressor, with its Fusite terminal, was unreasonably dangerous. *See Genie Indus., Inc. v. Matak*, 462 S.W.3d 2, 12 (Tex. 2015) (weighing the five factors to determine that, based on the record on appeal, the product at issue was not unreasonably dangerous).

### (ii) Dr. Russell Did Not Opine that Any Accident Means a Defect Exists.

Next, Fusite and Emerson argue that the premise for Dr. Russell's opinion on design defect was the notion that there is a defect whenever there is any product-related accident. In making this argument, they point to Dr. Russell's affidavit attached to Johnson's response to their motion to exclude. They misinterpret that affidavit. In that document, Dr. Russell stated that the Emerson compressor's initial internal failure was not a design defect. Rather, the compressor's "not failing in a safe manner"—that is, the design that allowed the terminal venting—was the design defect. In his affidavit, Dr. Russell explained that Emerson's corporate representative had been aware of the hazard of terminal venting for decades and that his opinion on the cause of the venting was "consistent with the problems described in Emerson's own patents." He then described safer alternative designs for terminals and compressors that he believed would have eliminated the hazard in this case. He further stated that "[g]iven a known hazard (such as terminal venting), manufacturers should design away the hazard, or if it cannot be eliminated by design, then warn about the hazard," and he discussed Emerson's failure to follow industry standards for warning about terminal venting. It is clear from reading Dr. Russell's affidavit as a whole that his opinion was not that there is a design defect any time a product is involved in an accident.

### (iii) Fusite and Emerson Misinterpret Dr. Russell's Testimony.

Finally, Fusite and Emerson address Dr. Russell's trial testimony, arguing that it "clearly rested on the engineering (nonlegal) notion that a design is defective unless it 'eliminate(s) the hazard.'" Thus, they argue, "[t]he basis for the opinion was an indisputable misapplication of the legal principle that products are not required to be risk-free. His misapplication of legal principles renders his opinion hopelessly unreliable." However, Fusite and Emerson misconstrue Dr. Russell's testimony. In the testimony they point to, Dr. Russell stated that as a design engineer, once a danger such as terminal venting is identified, the next step "is to do everything you can to design the product to eliminate the hazard so that nobody ever has to consider it or think about it again." He then discussed the other possible options for making the product less dangerous from most effective to least effective, from safeguarding against the hazard, to warning about the hazard, to training individuals to use the product. He did not testify that a product automatically has a design defect if the identified hazard cannot be eliminated.

### b. Johnson's Design Theory Does Not Fail on Causation.

Fusite and Emerson argue that Johnson's causation evidence fails because Johnson's theory of how the compressor contents ignited came only from Dr. Russell, and Dr. Russell could not explain the ignition source. Dr. Russell's testimony about the cause of ignition controverted Fusite and Emerson's theory that the contents of

41

the vent ignited because the compressor was still connected to a power source when Johnson removed the terminal's cover. The cause of the fire was irrelevant to Johnson's design defect claims based on the Fusite terminal. Johnson's claim was that with a different terminal, the terminal would have been significantly less likely to vent at all. If nothing leaked from the compressor, nothing could ignite. Thus, whether Dr. Russell had a good explanation for how the fire started is irrelevant. We therefore need not consider whether Dr. Russell was qualified to opine on the source of ignition. *See* Tex. R. App. P. 47.1. We overrule the remaining portions of Fusite and Emerson's third and fourth issues.[16]

### 3. We Decline to Amend the Pattern Jury Charge for Design Defect Claims.

Finally, Fusite and Emerson argue in their fifth issue that the jury should have been charged on the five factors of the risk-utility analysis for design defect claims discussed above. Because we have limited our discussion to the design defect claim raised against Fusite, we likewise address this issue only in terms of the jury charge pertaining to that claim (Question No. 1). *See* Tex. R. App. P. 47.1. Fusite and Emerson acknowledge that the Supreme Court of Texas has repeatedly refused to

---

[16]Despite the wording of Fusite and Emerson's fourth issue, we do not see in their brief a discussion challenging the factual sufficiency of the evidence supporting the design defect findings. To the extent that a factual sufficiency challenge is intertwined with their no-evidence discussion and challenge to Dr. Russell's testimony, we hold that the evidence is also factually sufficient to support the jury's design defect finding against Fusite. *See Pool*, 715 S.W.2d at 635; *Cain*, 709 S.W.2d at 176; *Garza*, 395 S.W.2d at 823.

approve a design defect jury charge other than the standard one given in this case, but they argue that because the jury is required to consider the five factors, refusal to submit them in the charge was harmful error. *See Genie Indus.*, 462 S.W.3d at 10 ("This balancing [of the five factors] is for the jury unless the evidence allows but one reasonable conclusion."). We must disagree.

Several decades ago, the Supreme Court of Texas approved a jury instruction for design defect strict products liability claims. *Turner v. Gen. Motors Corp.*, 584 S.W.2d 844, 851 (Tex. 1979). That instruction does not include the five factors. A few years later, that court again approved the same instruction. *Fleishman v. Guadiano*, 651 S.W.2d 730, 731 (Tex. 1983). The next year, that court addressed the question of a proper design defect jury charge and emphasized that it meant what it said in *Turner*:

> If *Turner* was not sufficiently specific to advise the bench and bar that in strict liability cases the jury is not to be instructed with balancing factors, surely we have laid this matter to rest by our opinion in *Fleishman*[,] . . . where we again endorsed the submission as approved by *Turner* and upheld the trial court's refusal to give any other instructions. **The jury need not and should not be burdened with surplus instructions.**

*Acord v. Gen. Motors Corp.*, 669 S.W.2d 111, 115–16 (Tex. 1984) (emphasis added). That instruction is what now appears in the Texas Pattern Jury Charges and what was given to the jury in this case.

The Supreme Court of Texas has made itself abundantly clear on this issue. If there is to be a change in the jury charge for design defect claims, it must come from

43

that court.  *Lubbock Cty. v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex. 2002) ("It is not the function of a court of appeals to abrogate or modify established precedent.  That function lies solely with this Court.") (citations omitted).  We overrule Fusite and Emerson's fifth issue.

## II.  Fusite and Emerson Challenge the Legal and Factual Sufficiency of the Evidence Supporting Mental Anguish Damages.

Fusite and Emerson argue in their sixth issue that the evidence is legally and factually insufficient to support the total findings of $5,000,000 in damages for mental anguish.

### A.  Mental Anguish Awards Must Be Supported by Evidence.

To support an award of mental anguish damages, "[t]here must be both [1] evidence of the existence of compensable mental anguish and [2] evidence to justify the amount awarded."  *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013).  The evidence must establish a relatively high degree of mental pain and distress or a substantial disruption in the plaintiff's daily routine.  *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995).  However, "'some types of disturbing or shocking injuries have been found sufficient to support an inference that the injury was accompanied by mental anguish.'"  *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 797 (Tex. 2006) (quoting *Parkway Co.*, 901 S.W.2d at 444); *see also City of Tyler v. Likes*, 962 S.W.2d 489, 495 (Tex. 1997) ("Where serious bodily injury is inflicted, . . . we

know that some degree of physical and mental suffering is the necessary result." (citation and internal quotation marks omitted)).

In awarding mental anguish damages, "[j]uries cannot simply pick a number and put it in the blank." *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). Rather, "[t]hey must find an amount that . . . would fairly and reasonably compensate for the loss." *Id.* (citation and internal quotation marks omitted). However, "the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages." *Id.* "The process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 551 (Tex. App.—Fort Worth 2006, pet. abated). "The amounts of damages awarded for pain and suffering . . . are necessarily speculative and each case must be judged on its own facts." *Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (citation and internal quotation marks omitted). "Once the existence of some . . . mental anguish . . . has been established, there is no objective way to measure the adequacy of the amount awarded as compensation." *Id.* (citation and internal quotation marks omitted).

**B.** **Legally and Factually Sufficient Evidence Supports the Jury's Finding of Mental Anguish Damages.**

Fusite and Emerson at least somewhat acknowledge that Johnson suffered mental anguish in the past.[17] They argue, however, that the evidence does not support the mental anguish damages amount awarded by the jury and that the amount should be no more than $1 million. They further argue that there is no evidence Johnson will suffer mental anguish in the future and certainly no evidence to support the amount of damages found by the jury. We first review the record for evidence relevant to the existence of mental anguish in the past and continuing in the future.

**1.** **Johnson's Evidence of His Mental State Before the Explosion.**

Several witnesses described what Johnson was like before the explosion. His sister testified that Johnson had been "loyal, as patient, soft-spoken, very—extremely giving, caring." "[H]e was always, you know, the backbone or strength in [the] family." He "loved to laugh. Always fun-loving, very upbeat." His son, Quen Wade, described his father pre-explosion as "[p]retty happy, laid back, . . . not easily flustered." He was "[j]ust in an overall good mood." He was "a giving person, a good role model." Even when Johnson and Wade's mother ended their relationship and his mother initially objected to Wade living with Johnson, Johnson "remained

---

[17]At one point in their brief, Fusite and Emerson assert that the evidence does not support the existence of past mental anguish. But in their argument addressing the award for past mental anguish damages, they concede that "[t]here is some evidence that Johnson suffered mental anguish in the past."

patient and remained kind." Johnson's girlfriend testified that "[h]e always was very calm and kind of happy-go-lucky, very peaceful," "just a real calm spirit." He did not anger easily. A former client described Johnson as "[v]ery positive, very caring" and a "go-getter." Johnson was very healthy, rarely getting sick. He was "always focus[]ed on his health," eating healthy and exercising regularly. He took pride in his appearance. He loved to travel.

Johnson had always been a hard worker, even as a teenager delivering newspapers. His sister testified that "he's just always been that way, just work, work, work." In 1984, he started working at Sears as a service technician, thus starting his career in the HVAC business. He worked at Sears for eleven years, leaving when he decided to start his own business. In addition to his HVAC business, he owned a laundromat that he had purchased and remodeled himself in the evenings after he had finished with his HVAC business for the day.

His sister explained that Johnson was someone who liked taking care of others, from his extended family to young men from his church who "were getting into trouble and having some issues," whom he mentored and allowed to stay with him. His sister testified that "[h]e always helped all of our family: My kids, my sister, my sister's kids, their families, cousins. And the list goes on." His cousin's daughter lived with him for a while and was "like his daughter." "[H]e loved to be able to help." He was "very active in the ministry" of his church, "truly dedicated," "just truly passionate about it."

Johnson was an elder at his church, and its pastor said that prior to the explosion, he would have described Johnson as "[o]utgoing, honest, great integrity," "everything you would hope that your elder would be," "[a] role model to young men." Johnson attended church every Sunday.

## 2. Johnson's Evidence of his Mental State Immediately After the Explosion.

In the initial aftermath of the explosion, after thinking about the kind of life that lay ahead of him as a severe burn victim, Johnson chose death. For the first twenty-three hours after the explosion, Johnson refused medical treatment. The ambulance records reported that Johnson told the paramedics, "You guys don't have to do all this" and "I don't want to live this way." Wade, Johnson's son, testified that the chaplain at the hospital told Johnson's family that Johnson had decided not to receive treatment because he wanted to die. Morris asked Johnson to consent to treatment, but Johnson replied that he "was done." Johnson expressed the same sentiment to Wade, telling him that he did not want to live with someone taking care of him. Johnson's girlfriend testified that he did not want to be an invalid. The pastor at Johnson's church testified that when he met with Johnson at the hospital, Johnson "share[d] . . . how painful this is, how [un]comfortable, the agony, . . . the bleakness of the future, because he's been . . . the worker. And he tells [the pastor that] he doesn't want to live." Johnson testified similarly at trial, stating, "I felt that I was going to have a very diminished life, and I didn't want anybody taking—having to

take care of me. You know, they had their own lives." He elaborated that he did not see a future for himself when he was "unable to do anything for [himself], having to depend on other people[:] I mean, I preferred to be in the role of helping people instead of depending on people. So I just didn't see [getting treatment] being something very—very beneficial for me."

Dr. Enrique Almaguer, a plastic and reconstructive surgeon, testified about burn injuries generally and Johnson's injuries specifically. Not only was Dr. Almaguer not surprised by Johnson's initially refusing treatment, but he agreed with it. He told the jury that having seen so many burn injuries and "the suffering and the loss of function that has occurred with these major burns," "if I ever get burned . . . more than [thirty] percent of my total body surface area, I hope and pray that I have the courage to run back into the fire, because I don't want to live this way myself." Johnson was burned over sixty percent of his total body surface area.

Dr. Almaguer further testified that severe burn patients like Johnson "suffer from a tremendous [loss] of self-esteem . . . and they feel incompetent, impotent. They feel useless, and they become depressed. Oftentimes they become reclusive." Although this testimony was about severe burn patients in general, as we discuss next, the testimony at trial showed that Dr. Almaguer's description reflects the effects Johnson's injuries had on him.

### 3. Johnson's Evidence of his Mental State After Receiving Treatment.

Johnson testified about the effect the accident and resulting injuries have had on him. Although he stated that the explosion is not easy for him to talk about, he agreed with his son that life after the explosion has been difficult for him emotionally. Because of his injuries, he can no longer work, but for most of his life, his work was his life. Despite being heavily involved in his church before, he has not returned to church since the accident because he is "not ready to face the people."

Dr. Almaguer explained that serious burns like Johnson's can lead to scars that cause stiffness and lack of mobility in the affected body parts. At his first meeting with Johnson, Johnson told him that he was "very distraught" about his burn scars and injuries and wanted to have them corrected so that "he could do the bare minimum in life like feeding himself and walking." At their second meeting, Johnson still had restriction of movement in his upper extremities, hands, and neck and jawline.

Dr. Almaguer agreed that generally, a burn patient who has some improvement in range of motion and a decrease in pain will, over time, have at least some improvement in some of his psychological state. Dr. Almaguer sees some additional improvement in the future for Johnson. Nevertheless, Dr. Almaguer stated that Johnson's life has changed completely because of his injuries. Johnson can no longer work, has no endurance, and cannot do simple activities of daily living. He had to

have his son sell his laundromat business for him because Johnson could no longer manage it himself, and his son "had a lot on him at that time, and . . . wasn't going to be able to maintain it." Johnson's girlfriend testified that Johnson still could not make a fist and could not grip to open jars or even do "something as simple as picking up a coin off the floor." Another doctor who testified stated that while Johnson can bathe and groom himself, he cannot button shirts or tie his shoes. Johnson's girlfriend had to put foam tubing over forks and spoons so that he could grip them and learn to feed himself again. These physical effects are not themselves evidence of mental anguish, but witnesses testified about the impact they had on Johnson's mental state.

As numerous witnesses testified, the effects the injuries have had on Johnson's life have in turn affected his mental state to such a degree that his personality has changed. A member of Johnson's church, who lives in his neighborhood and who has known him for seventeen years, testified that "before [the explosion], you could always stop and hold a conversation and stuff like that with him and he's—he's not like that anymore." Now, Johnson does not "want to . . . be around or talk to people."

Johnson's sister testified that while Johnson was in the hospital, he was "very angry," "very short," and "very agitated." During the initial treatment, he had moments when he reverted back to not wanting treatment. At that point, he was "very depressed," reserved, and "very introverted." He still does not like to go out in public because he does not want people to see him. His depression is getting better,

"but he's got a long way to go"; "he has an issue with the fact that he can't help or do things solely for himself."

Johnson's girlfriend testified that she could "tell a big difference" in Johnson's mental state since the accident. When they were doing wound care, "[t]here was a lot of tension, and he . . . would snap at you." As of the time of trial, she still considered him to be a friendly person, but more withdrawn. She stated that he "really struggle[s]" with how his voice and appearance have changed since the explosion.

Johnson's pastor testified that the first time he saw Johnson again after initially seeing him in the hospital, he was "a different Clarence." The pastor thought "there was even some, almost—did I make the right decision, because of the pain and the things that he was going through." The pastor found Johnson "a little . . . disconnected[,] . . . possibly because of his appearance."

Wade, Johnson's son, testified that Johnson remained withdrawn and depressed after his release from the hospital. Wade lived with Johnson for about six months, and it "was very difficult at times" because "you could tell that he was frustrated that he was in this situation, and he wanted to do better and so he would lash out at the people closest to him." "I think it just rocked his world." There were times when Johnson would not come out of his room. Wade explained that Johnson's "overall mood has just changed." "[H]e's not the happiest at all times. He has his days where he's okay, and there are days where he is not." Growing up, Wade did not see his father express emotions, but "[s]ince this has happened, [Johnson] is

52

more emotional.  He cries more."  "Before [the accident] he, was not—not like that."

Wade stated, "I know this is exactly—this is directly related to this accident."

### 4. The Evidence Sufficiently Shows that Johnson Suffered Past and Future Mental Anguish.

In summary, no real argument can be made that the evidence failed to show that Johnson suffered mental anguish in the first twenty-four hours after the explosion.  The evidence further supported a finding that Johnson continued to suffer mental anguish after those first twenty-four hours.  During his several-months stay in the hospital, he was "really depressed" and several times changed his mind about continuing with his treatment.  He was "very angry" and "very agitated."  The evidence further shows that Johnson continues to struggle with the physical changes caused by the explosion.  A once sociable person heavily involved in his church, he is now a virtual recluse.  He is more emotional, someone who cries in front of his son, something he never did before.  He once ran two businesses and spent most of his time working and taking care of others, and now he cannot run either business or take care of others like he once did.  While his depression has improved some, "he's got a long way to go."  There was no evidence that his physical injuries will resolve in the future to the extent that he will be able to do the work he once did or that his appearance will improve, and thus no evidence that the source of mental anguish will abate.  The jury's finding of the existence of past mental anguish continuing into the

future is supported by the evidence and is not against the great weight and preponderance of the evidence.

## C. Legally and Factually Sufficient Evidence Supports the Amount of the Jury's Mental Anguish Awards.

### 1. The Jury's Award for Past Mental Anguish Damages is Supported by the Evidence.

Based on the evidence at trial, the jury's award for past mental anguish damages was fair and reasonable and not against the great weight and preponderance of the evidence.

#### a. Other Factors Do Not Change Our Conclusion.

We need not consider, as courts sometimes do,[18] the proportionality of the economic and noneconomic awards, given our conclusion that the evidence supports the award. *See Marvelli v. Alston*, 100 S.W.3d 460, 482 (Tex. App.—Fort Worth 2003, pet. denied) (stating that "as long as sufficient probative evidence exists to support the

---

[18]Courts primarily look at damage ratios in evaluating the constitutionality of an award. Courts consider the ratio of compensatory damages to punitive damages in reviewing the constitutionality of a punitive damages award and often consider the ratio of economic damages to mental anguish damages in defamation cases in considering whether the evidence supports the award, in part to ensure that the award does not run afoul of the First Amendment. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 308 (Tex. 2006) (looking at the ratio of compensatory damages to punitive damages and noting that awards exceeding a single-digit ratio raise due process concerns); *Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002) (considering the ratio of economic damages to noneconomic damages because "the First Amendment requires appellate review of amounts awarded for non-economic damages in defamation cases to ensure that any recovery only compensates the plaintiff for actual injuries and is not a disguised disapproval of the defendant"). There is no issue as to the constitutionality of the award in this case.

jury's verdict, neither the reviewing court nor the trial court is entitled to substitute its judgment for that of the jury," regardless of the ratio of economic to noneconomic damages); *cf. Bishop Abbey Homes, Ltd. v. Hale*, No. 05-14-01137-CV, 2015 WL 9167799, at *18 (Tex. App.—Dallas Dec. 16, 2015) (mem. op.) (considering the ratio of the plaintiffs' mental anguish damages to their pecuniary losses in assessing the amount of mental anguish damages to suggest as a remittitur), *supplemented*, No. 05-14-01137-CV, 2016 WL 80546 (Tex. App.—Dallas Jan. 7, 2016, no pet.) (mem. op.); *Moyer v. Moyer*, No. 03-03-00751-CV, 2005 WL 2043823, at *14 (Tex. App.—Austin Aug. 26, 2005, no pet.) (mem. op.) (looking at the ratio of mental-anguish damages to other damages to determine if the jury's award for emotional distress was excessive). But, even considering the ratio in this case, we find ample support for the jury's award. The total award for mental anguish damages past and future was approximately 1.24 times the amount of economic damages, a reasonable ratio. *Compare Houston Livestock Show & Rodeo, Inc. v. Hamrick*, 125 S.W.3d 555, 581 (Tex. App.—Austin 2003, no pet.) ("The ratio of appellees' mental-anguish damages to injury-to-reputation damages ranged from a low of 2.5 to 1 to a high of 5 to 1, a ratio that we find reasonable in relation to their other damages."), *with Bentley*, 94 S.W.3d at 607 (holding that the evidence did not support a $7 million award for mental anguish damages in a defamation case, an amount more than forty times the amount awarded for damage to the plaintiff's reputation). Johnson's total award for

all noneconomic damages was in reasonable proportion to the total award for economic damages—approximately three times the amount of economic damages.

Further, courts sometimes reference awards in other cases to support their holding the evidence sufficient to support a mental anguish award. While courts generally "agree that, in appropriate circumstances, awards in similar cases can be relevant in analyzing whether an award of damages is excessive," courts also agree that "[e]ach case must be measured by its own facts." *Critical Path Res., Inc. v. Cuevas*, No. 14-16-00036-CV, 2018 WL 1532343, at *28 (Tex. App.—Houston [14th Dist.] Mar. 29, 2018), *supplemented*, No. 14-16-00036-CV, 2018 WL 2106599 (Tex. App.— Houston [14th Dist.] May 8, 2018, no pet.). Because the appropriateness of an award in a case turns on the specific facts of that case, referencing the amounts awarded in other cases is of limited help to a court reviewing the sufficiency of the evidence to support an award.[19] Fusite and Emerson assert that "the case law is sparse on burn

---

[19]This court has held both that "[e]ven though each case must be judged on its own unique facts, it is proper to consider other approved awards in similar cases to determine if an award for pain and suffering is excessive," *HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 872 (Tex. App.—Fort Worth 2005, no pet.), and that "[c]omparisons with other cases or verdicts is of little help because the same loss will result in different damages to different individuals." *George Grubbs Enters., Inc. v. Bien*, 881 S.W.2d 843, 858 (Tex. App.—Fort Worth 1994), *rev'd on other grounds*, 900 S.W.2d 337 (Tex. 1995). *Compare Moyer*, 2005 WL 2043823, at *14 (stating that the jury's total award for emotional distress was not out of proportion with similar Texas cases), *with Harris v. Balderas*, 949 S.W.2d 42, 44 (Tex. App.—San Antonio 1997, no writ) ("There is no certain standard by which personal injury damages can be measured, and each case must stand on its own facts and circumstances, and a comparison with other cases on amounts of verdicts are of little or no help." (citations omitted)). *See also Cuevas*, 2018 WL 1532343, at *29 ("[M]odification of damages, which is a speculative

56

victims' awards for past mental anguish," "[b]ut non-burn plaintiffs who have suffered catastrophic, non-fatal injuries have been awarded $1 million or less for past mental anguish." While Fusite and Emerson cite cases with mental anguish awards lower than the amount awarded here, other cases uphold awards similar to Johnson's. *See, e.g.*, *id.* at \*27, \*29, \*31 (sustaining awards of past mental anguish of $2 million and $5 million for two burn victims); *Burry*, 203 S.W.3d at 551, 553 (affirming award for past and future pain and mental anguish of $5 million and $10 million, respectively). We cannot say that the award for past mental anguish damages is beyond what a reasonable jury could award based on the evidence such that we must deem the evidence insufficient to support it.

b. **Any Damages Recovery for Johnson for Appearance-Related Anguish Does Not Duplicate His Disfigurement Award.**

Fusite and Emerson also argue that Johnson's feelings about his appearance cannot be considered in evaluating whether the evidence supports the past mental anguish award because he was compensated for those feelings in the disfigurement awards, and any additional amount awarded under mental anguish would be an impermissible double recovery. The jury heard ample evidence of Johnson's mental anguish related to his inability to live the life he once had, unrelated to Johnson's

endeavor, cannot be based upon case precedent alone, because comparison of injuries in different cases is virtually impossible.") (citation omitted).

physical appearance. But we disagree that Johnson would get a double recovery if the jury considered his anguish related to his physical appearance.

Fusite and Emerson are correct that courts have held that a jury may include compensation for a plaintiff's embarrassment about a disfigurement in a disfigurement damages award. *See Hopkins Cty. Hosp. Dist. v. Allen*, 760 S.W.2d 341, 344 (Tex. App.—Texarkana 1988, no writ). However, "[t]here logically may be some overlap among the physical impairment, pain, suffering, mental anguish, and disfigurement categories of non-economic damages." *Day v. Domin*, No. 05-14-00467-CV, 2015 WL 1743153, at *2 (Tex. App.—Dallas Apr. 16, 2015, no pet.) (mem. op.). The jury charge here had no definitions for "disfigurement," "physical impairment," or "mental anguish." Thus, the jury could have allocated damages for the physical limitations from which Johnson now suffers under "physical impairment," the damages related to his appearance under "disfigurement," and damages to his emotional and mental state caused by his appearance and physical limitations under "mental anguish." Further, the jury charge allowed such an allocation of damages. The charge instructed the jury that, in assessing damages, it should "[c]onsider the elements of damages listed below and none other" and "[c]onsider each element separately." The charge further instructed, "Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any." We must presume that the jury followed these instructions. *See Golden Eagle*, 116 S.W.3d

58

at 773. Because the jury, in applying the charge, could have considered mental anguish related to Johnson's appearance in awarding past mental anguish damages, we must consider evidence on that point in our review.

Applying the factual sufficiency standard of review, considering the evidence of the effects that the explosion and resulting injuries had on Johnson and his life, we cannot say that the evidence supporting the jury's award of past mental anguish damages is so weak or so contrary to the overwhelming weight of all the evidence as to make the award excessive.[20] We overrule this part of Fusite and Emerson's sixth issue.

### 2. The Jury's Award for Future Mental Anguish Damages is Supported by the Evidence.

As for future mental anguish damages, Johnson asked the jury to award him $5.2 million in future mental anguish damages—"one penny for every second that he's alive," based on the assumption that he will live another twenty-five years. The jury awarded him $3 million. Fusite and Emerson argue that the evidence does not support the jury's award.

In support of this argument, Fusite and Emerson mainly rely on a small number of pages in Johnson's lengthy medical records, asserting that those pages

---

[20]To the extent Fusite and Emerson briefly argue that Johnson's "medical records show[ing] that he denied experiencing any depression, severe anxiety, or acute distress" make the past mental anguish award excessive, we reject their argument for the same reasons we reject their identical challenge to the award of damages for future mental anguish. *See* discussion *infra* Section II.C.2.

show that Johnson had denied experiencing depression, severe anxiety, or acute distress, and therefore the award for future mental anguish is excessive.[21] However, the records do not make the jury's damages finding excessive or against the great weight and preponderance of the evidence.

*First*, all the records are evaluations or observations of Johnson, but none appear to be from a psychologist, psychiatrist, or any health care provider examining Johnson specifically for the purpose of evaluating his mental state. Over half of the references are from the records of a surgeon who made brief notes of his review of Johnson's body systems at Johnson's appointments. Other records referenced by Fusite and Emerson include chart notes from Johnson's hospital stay, an office visit with a dermatologist, a pre-operation clearance visit with another surgeon, and a pre-operation clearance from a cardiologist; in other words, records from appointments where the primary purpose was not to evaluate Johnson's mental state. For some, there is no indication that the doctor's remarks—such as "awake, alert, in no acute distress. Oriented to person, place, time, and situation"—are any indication of whether Johnson felt depression or other symptoms relevant to mental anguish.

---

[21]While Fusite and Emerson provided us with exhibit numbers for the medical records they reference, they did not provide this court with references to specific pages in the voluminous appellate record. Nor did they identify which reporter's record volume the specific records appear in. There are fifty-two volumes in the reporter's record, thirty-five of which contain trial exhibits. The exhibits referenced by Fusite and Emerson are collectively nearly 2,700 pages long, and Fusite and Emerson relied on just 18 of those 2,700 pages. After an exhaustive effort, we have managed to locate all but one of the referenced pages.

*Second*, with one exception, all of the relied-on medical record notes are conclusory. They give no indication of what Johnson was asked to prompt the doctor's note—or indeed, for many of the records, that Johnson was asked anything at all. When the records do indicate that Johnson had been asked a question directly—because the record indicates that Johnson "denied depression"—the records indicate only that Johnson had been asked *something*, but what and in what context is unknown. The only record that indicates what was asked of Johnson was a questionnaire, in the form of a checklist, about his current health given to him to fill out at an appointment. Johnson checked "no" for "[u]nusual or severe stress," "[s]evere anxiety," "[s]ignificant depression," or "[s]ignificant changes in mood" in the last twelve months. This questionnaire does not indicate that Johnson felt no stress, anxiety, depression, or changes in mood, and the forms do not define what level of stress, anxiety, depression, or changes in mood are considered "severe" or "significant." For that matter, the questionnaire does not even indicate that it was Johnson, with his difficulty gripping objects, who filled it out, or, if someone filled it out for him, whether the person consulted Johnson about the answers. At trial, Fusite and Emerson declined to ask Johnson any questions on the topic of mental anguish, whether about the questionnaire or otherwise. The checkmarks on the questionnaire do not override all the evidence presented at trial about Johnson's mental anguish.

In sum, the amount awarded was not without support in the evidence. The evidence of mental anguish amounted to more than "mere emotions." *See Latham v.*

61

*Castillo*, 972 S.W.2d 66, 70 (Tex. 1998) (distinguishing cases disallowing mental anguish awards where the evidence "amounted to 'mere emotions'"). The amount awarded was large, but so was the effect of the explosion on Johnson's life and the resulting effect on his mental state, as established by the evidence. The award is not out of line with other awards in cases involving the effects of dramatic life events. *See, e.g.*, *Diamond Offshore Servs. Ltd. v. Williams*, 510 S.W.3d 57, 79 (Tex. App.—Houston [1st Dist.] 2015) (upholding award of $3.4 million for future pain and mental anguish resulting from a back injury that made it difficult for plaintiff to participate in life activities he previously could), *rev'd on other grounds*, 542 S.W.3d 539 (Tex. 2018); *Wackenhut Corr. Corp. v. de la Rosa*, 305 S.W.3d 594, 636–37 (Tex. App.—Corpus Christi 2009, no pet.) (upholding award of $2 million for future mental anguish for each of decedent's children), *abrogated on other grounds*, *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143 (Tex. 2015). We overrule the remainder of Fusite and Emerson's sixth issue.

## III.   The Insurance Company's Award was Appropriate.

Finally, Fusite and Emerson argue that we should reverse the judgment for the Insurance Company if we reverse Johnson's award because the insurance company's tort claims "largely tracked those of Johnson." Because we affirm Johnson's award, we likewise affirm the Insurance Company's award.

## CONCLUSION

Having overruled Fusite and Emerson's six issues, we affirm the trial court's judgment.

/s/ Mark T. Pittman
Mark T. Pittman
Justice

Delivered: October 18, 2018